# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# PINE BLUFF DIVISION

**NICKARLOS A. BANKS**                                                                **PLAINTIFF**
**ADC #106872**

**V.**                            **CASE NO. 5:18-CV-293-BSM-BD**

**WENDY KELLEY,** *et al.*                                                        **DEFENDANTS**

## RECOMMENDED DISPOSITION

**I.     Procedures for Filing Objections**

This Recommendation for dismissal has been sent to Judge Brian S. Miller. Any party may file objections if they disagree with the findings or conclusions set out in the Recommendation. Objections should be specific and should include the factual or legal basis for the objection.

To be considered, objections must be filed within 14 days. If parties do not file objections, they risk waiving the right to appeal questions of fact. And, if no objections are filed, Judge Miller can adopt this Recommendation without independently reviewing the record.

**II.    Background**

Plaintiff Nickarlos A. Banks, an inmate at the Varner Unit of the Arkansas Division of Correction (ADC), filed this civil rights lawsuit without the help of a lawyer to challenge the ADC inmate correspondence policy.[1] (Doc. No. 1) Specifically, Mr.

---

[1] Mr. Banks filed this lawsuit along with inmates Anthony Lamar, Michael Snyder, Paul Latham, and Edgar Guinther. (Doc. No. 1) Under Court policy, however, each Plaintiff was required to proceed in a separate lawsuit.

Banks claims that the ADC policy limiting inmates to three black-and-white photocopied pages per letter and retention of five photographs is unconstitutional.[2] (Doc. Nos. 1; 8; 15)

Defendant Kelley does not dispute the particulars of the inmate correspondence policy. She moves for summary judgment, however, contending that the policy is constitutional. (Doc. No. 67) Mr. Banks has not responded to the motion for summary judgment.

### III.     Standard

Summary judgment means that the court rules in favor of a party without the need for a trial. A moving party is entitled to summary judgment if the evidence, viewed in the light most favorable to the party on the other side of the lawsuit, shows that there is no genuine dispute as to any fact that is important to the outcome of the case. FED.R.CIV.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246 (1986).

---

[2] The Court previously dismissed all other claims and Defendants. (Doc. Nos. 16; 27; 33; 34)

## IV.     Facts

In 2015, Defendant Wendy Kelley was appointed as Director of the ADC.[3] (Doc. No. 67-8, ¶ 1) According to her affidavit, beginning in 2015, ADC officials began to see an increase in synthetic drugs, including K2, in the ADC's prison units. (Doc. No. 67-8, ¶ 7) In 2013, there were six incidents involving K2 at the ADC. (Doc. No. 67-8, ¶ 10) In 2014, the number had jumped to 46. (Doc. No. 67-8, ¶ 11) In 2015, the ADC recorded 179 K2-related incidents. (Doc. No. 67-8, ¶ 12) In 2016, there were 499 such incidents. (Doc. No. 67-8, ¶ 13) And in 2017, the number of K2-related incidents had climbed to 1,136. (Doc. No. 67-8, ¶ 14)

According to Defendant Kelley, synthetic drugs such as K2 present a serious danger in prisons because their effects are unpredictable; K2 is known to cause seizures, tremors, unconsciousness, vomiting, hallucinations, paranoia, numbness, anxiety attacks, panic attacks, aggression, headaches, inability to speak, and death. (Doc. No. 67-8, ¶ 9)

In response to the rising problem of synthetic drugs, the ADC implemented efforts to educate inmates, visitors, and staff about the dangers of K2. (Doc. No. 67-8, ¶ 15) Officials posted signs throughout the interior and exterior of every facility and presented educational videos in the barracks to illustrate the dangerous effects of K2. (Doc. No. 67-8, ¶ 15) The ADC employed various active and passive search and surveillance methods

---

[3] In 2019, Defendant Kelley was appointed Secretary of the ADC until her retirement in 2020. (Doc. No. 67-8, ¶ 3-4)

in the mail room to screen for illegal substances. (Doc. No. 67-8, ¶ 16) The scanners the ADC used, however, were not effective at detecting synthetic drugs. (Doc. No. 67-8, ¶16)

Despite its efforts to mitigate K2 use, problems with the drug persisted. (Doc. No. 67-8, ¶ 17) According to the Arkansas State Crime Lab investigations, between July 1, 2016 and August 2017, at least ten ADC inmate deaths were linked to K2 or synthetic cannabinoids. (Doc. No. 67-8, ¶ 16) In the course of an investigation into the K2 problem, ADC officials discovered that inmates were receiving drugs through mail that had been soaked in drugs or secreted under postage stamps. (Doc. No. 67-8, ¶ 22) Some inmates who died as a result of drugs were found with papers contaminated with K2. (Doc. No. 67-8, ¶ 24)

According to the ADC inmate correspondence policy, inmates are permitted to correspond with family, friends, officials, and other contacts with minimal interference consistent with assuring legitimate security needs of prison facilities. (Doc. Nos. 67-1; 67-2; 67-3) Administrative Directive (AD) 16-28 was the ADC's correspondence policy in place from August 1, 2016, through August 21, 2017. (Doc. No. 67-1) Under that policy, all inmate mail was opened and inspected for contraband. (Doc. No. 67-1, p.2) Contraband was defined as "any item that is not permitted under the usual rule of the unit."[4] (Doc. No. 67-1, p.2) When discovered, contraband was either mailed back to the

---

[4] During all times relevant to this lawsuit, the inmate property control policy defined contraband as, "[a]ny item or items determined by the Board of Corrections or ADC to jeopardize the safety, security, or good order of its institutions, including but not limited

4

sender at the inmate's expense or destroyed. (Doc. No. 67-1, p.2) The policy did not permit original newspapers because newsprint is difficult to screen for illicit substances. (Doc. No. 67-1, p.2) Photocopies of newspapers were allowed so long as they did not violate other policies or provisions. (Doc. No. 67-1, p.2)

According to Defendant Kelley's testimony, providing a safe and secure environment for inmates, visitors, and staff remained her top priority. (Doc. No. 67-8, ¶ 5) To that end, she reconsidered the inmate correspondence policy in 2017 to address the problem of drugs entering the prison through mail sent to inmates. (Doc. No. 67-8, ¶ 23) Defendant Kelley found that the Virginia Department of Correction (VDC) had dealt with its K2 problem by limiting inmates' incoming general correspondence to photocopies. (Doc. No. 67-8, ¶ 26) Defendant Kelley discussed the general mailing patterns with mailroom administrators and determined that most inmate correspondence averaged three sheets of paper. (Doc. No. 67-8, ¶ 26) She also determined that one stamp was sufficient to mail three sheets of paper and one envelope. (Doc. No. 67-8, ¶ 27) She concluded that limiting correspondence to three sheets of paper would not create an undue hardship given that this was the average length of inmate correspondence and

---

to items which are illegal, authorized property that has been altered, unauthorized property, property in excess of established unit/center limits, property in an inmate's possession in an unauthorized area, spoiled food items, property accumulated for the purpose of barter or trade, property obtained through trafficking and trading or for which no reasonable explanation is given for its origin, or banned by policies." (Doc. Nos. 67-5; 67-6)

5

because there were other means of communication available to inmates, such as telephone calls, video visits, and email. (Doc. No. 67-8, ¶ 28)

On August 21, 2017, the ADC adopted a new correspondence policy, AD 17-23. (Doc. No. 67-4) Prior to the adoption of the policy, the ADC posted the announcement on its website. (Doc. Nos. 67-7; 67-8, ¶ 8) The ADC also posted a memorandum throughout all ADC units and facilities. (Doc. No. 67-4) According to the website, to reduce the introduction of contraband into facilities, the new policy would limit incoming paper correspondence that was not privileged. (Doc. No. 67-7, p.3)

Per AD 17-23, there is no limit on the number of letters an inmate may send or receive; however, inbound inmate correspondence is generally limited to three pages, which includes two black-and-white photocopied pages of correspondence and a photocopy of the envelope. (Doc. No. 67-2, pp.2, 6) The two photocopied pages are two-sided. (Doc. No. 67-2, p.2; 67-8, ¶ 28) The originals are shredded after copies is made. (Doc. No. 67-2, p.2) According to Defendant Kelley, it was necessary to deliver photocopies rather than original letters to inmates because official found that K2 was being smuggled into prison units on paper disguised as correspondence. (Doc. No. 67-8, ¶ 24)

Under the new policy, individual photographs are considered one sheet of paper and color photographs are not made. (Doc. No. 67-2, p.3) In the past, as explained by

6

Defendant Kelley, color printers were used to create false identification cards and, therefore, are not allowed in the institution. (Doc. No. 67-8, ¶ 30)

The new policy required newsprint to be photocopied, as under the previous policy. (Doc. No. 67-2, p.4) Photocopied newsprint under the new policy must be letter-sized or smaller; and each sheet counts as one of the three permitted pages. (Doc. No. 67-2, p.4)

Any correspondence exceeding three letter-sized sheets of paper with writing on one side is treated as contraband and rejected. (Doc. No. 67-2, p.2). If the correspondence is rejected, it can be returned to the sender at the inmate's expense; or the inmate may agree to its destruction. (Doc. No. 67-2, p.3). On the website, families are instructed to write all letters in dark ink. (Doc. No. 67-7) Inmates are encouraged to advise their families to send letters and photographs that comply with the updated policy. (Doc. No. 67-8, ¶3 2)

On August 9, 2018, the correspondence policy was revised to further detail how rejected mail is to be handled. (Doc. No. 67-3) Under AD 18-37, a notification is sent to an inmate when his or her mail is rejected, stating why it was rejected. (Doc. No. 67-3, p.3) The inmate then has 30 days to pay for return postage if a return address is provided. (Doc. No. 67-3, p.3)

Under both past and current policies, an inmate can possess only five photographs at one time. (Doc. No. 67-8, ¶ 51) According to Defendant Kelley, there are security

reasons for the limits on photographs. (Doc. No. 67-8, ¶ 51) First, excessive paper creates a fire hazard and makes searching for contraband—including correspondence about gang activity, illegal activity, inappropriate photographs, and inappropriate relationships—difficult and time consuming. (Doc. No. 67-8, ¶ 51) Second, allowing inmates unlimited photographs under an earlier policy required officers to spend undue time cataloguing inmates' inventory. (Doc. No. 67-8, ¶ 54) A third security concern involves inmates' use of paper and photographs to obstruct the view into their cells. And fourth, allowing unlimited photographs disrupts operations by requiring officials to resolve disputes when inmates allege officers or other inmates confiscated or destroyed their photographs. (Doc. No. 67-8, ¶¶55-56)

All three ADC correspondence policies permit inmates to receive correspondence, including photographs, electronically if the inmate has an ADC approved MP4 player. (Doc. Nos.77-1; 67-2; 67-3) An inmate can view photographs electronically in color; and electronic photographs are not subject to the five-photograph limit. (Doc. No. 67-8, ¶ 34)

If an inmate does not have an approved MP4 player, the ADC permits the inmate to print the electronic photographs provided by the ADC's electronic email vendor. (Doc. No. 67-8, ¶ 35) The vendor provides the required hardware—including a color copier, software, and technical support. (Doc. No. 67-8, ¶ 35) Inmates or their families pay the vendor directly for the service; in return, the vendor provides electronic correspondence through the MP4 player kiosk or in print, using the printer, ink, and paper provided by the

8

vendor. (Doc. No. 67-8, ¶ 35) The price of the email and photograph package is set by the vendor; and the cost depends on the package chosen by the inmate or inmate's family. (Doc. No. 67-8, ¶ 36)

The ADC offers video visitation through Securus Technologies. (Doc. No. 67-8, ¶ 38) Video visits must be scheduled at least 48 hours in advance, and each visit is 30 minutes in length. (Doc. No. 67-8, ¶ 38) As of January 1, 2018, the cost of a video visit was $12.99 for 30 minutes. The cost of the video visit is set by Securus Technologies. (Doc. No. 67-8, ¶ 39)

Prior to COVID-19, inmates could have in-person visits. (Doc. No. 67-8, ¶ 40) Class I inmates were permitted weekly visitation and Class II, III, and IV inmates were permitted two visits per month. (Doc. No. 67-8, ¶ 40)

The ADC provides coinless telephones for inmate use. ((Doc. No. 67-8, ¶ 41) Due to the restrictions on in-person visits caused by COVID-19, the cost of phone calls, electronic correspondence, and video visits has been reduced. (Doc. No. 67-8, ¶ 42) The cost of a 30-minute remote video visitation is now $2.50. (Doc. No. 67-8, ¶ 42)

In 2018, the average number of K2-related incidents decreased to approximately 63 per month. (Doc. No. 67-8, ¶ 43) The yearly number of K2-related incidents dropped from 1,136 in 2017 to 849 in 2018. (Doc. No. 67-8, ¶ 43) In 2019, the number of K2 incidents dropped to 542. (Doc. No. 67-8, ¶ 44)

## V. <u>**Discussion**</u>

According to Mr. Banks, the ADC correspondence policy violates his first and fourteenth amendment rights by restricting his incoming non-legal mail to three pages of black-and-white photocopied pages and by limiting him to five photographs. (Doc. Nos. 1; 8; 15)

### A. First Amendment

Prisoners have a first amendment right to receive non-legal mail and photographs. *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989); *Davis v. Norris*, 249 F.3d 800, 801 (8th Cir. 2001). A prison may place limits on an inmate's receipt of mail and photographs, however, so long as the regulations are "reasonably related to legitimate penological interests." *Id.* Prison administrators are entitled to, "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

When determining whether the regulations at issue here are reasonably related to a legitimate penological interest, the Court must consider several factors: whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; whether there are alternative means of exercising the rights affected by the regulations; the effect that accommodating the asserted right would have on guards, other inmates, and the allocation of prison resources generally; and

whether any ready alternatives exist to the prison regulation. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Murphy v. Mo. Dep't. of Corr.,* 372 F.3d 979, 983-84 (8th Cir 2004); *Griffin v. Lombardi*, 946 F.2d 604, 607 (8th Cir. 1991).

            1.        Limit of Three-Pages of Black and White Photocopies

                    a. Rational Connection between Regulation
                        and Governmental Interest

The first question is whether the ADC's current limits on inmates' ability to receive mail and photographs have a "valid rational connection" to a legitimate government purpose. *Turner*, 482 U.S. at 89. A regulation cannot be sustained if the connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. *Id.* at 89-90. Institutional security is the most compelling government interest in a prison setting. *Simpson v. County of Cape Girardeau, Mo.*, 879 F.3d 273, 289 (8th Cir. 2018) (citing *Murphy,* 372 F.3d at 983)).

According to Defendant Kelley, the purpose of barring inmates from receiving original copies of incoming mail and limiting each letter to three pages is to control the spread of contraband, mainly drugs, from entering the prison units. Defendant Kelley gave a reasonable explanation for barring color copies of photographs; that is, color printers at the prison had resulted in the printing of false identification cards. Given the level of K2 coming into the ADC and the dire consequences of K2 use in the prisons, there is a rational connection between the challenged ADC policy limiting incoming mail

to three pages the government's legitimate interest in controlling the entry of contraband into the ADC.

> b. Alternative Means for Inmates to Exercise Right

A second consideration in reviewing the restrictions the ADC has placed on inmates' receipt of mail and possession of photographs turns on the availability of other means inmates have to communicate and correspond with friends and family. *Turner*, 482 U.S. at 89-90. If there are adequate alternative means, courts ordinarily give deference to correction officers when assessing the validity of challenged regulations. *Id.* at 90. "[A]lternatives to the type or amount of speech at issue need not be ideal; they need only be available." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).

Here, Mr. Banks is not prohibited from receiving written correspondence; and there is no limit to the number of letters he is allowed to send or receive. The limit at issue is the three-page limit per letter received. Notably, privileged mail is not subject to the three-page limit.

Furthermore, the ADC provides alternative means for inmates to communicate with their friends and family: ADC-approved MP4 players; emails; video conferences; and coinless telephone calls. Mr. Banks objects to the restriction on color photographs. But there are alternatives for inmates to access color photographs: pay the ADC vendor for color photographs or view color photographs on MP4 players. Because there are alternative means available for inmates to exercise their first amendment rights to

communicate with individuals outside the prison, this *Turner* factor weighs in favor of Defendant Kelley.

### c. The Effect of the Accommodation

The Court must also consider the effect that accommodating inmates' desire for a more lenient mail and photograph policy would impose on guards, other inmates, and prison resources. *Turner*, 482 U.S. at 90. Any change in a prison system is likely to have ramification on the liberty of others or on the use of prison's resources for preserving order. *Id*. Courts give particular deference to the discretion of the correctional officials if the accommodation of the asserted right will have a significant "ripple effect" on fellow inmates or prison staff. *Id.* at 92.

Here, the undisputed evidence demonstrates that, since the current limits on the number of pages per letter received were imposed, there has been a marked reduction in incidents involving K2 at the ADC. Accordingly, removing this restriction to accommodate Mr. Banks's first amendment right to communicate would interfere with the ADC's ability to maintain safety and security. The limitation has increased inmate safety and weighs in favor of Defendant Kelley.

### d. Ready Alternatives

The existence of obvious, easy alternatives can be considered in determining whether a regulation is reasonable or instead an exaggerated response to prison officials' concerns. *Turner*, 482 U.S. at 90. There are no readily apparent alternatives that would

13

provide the same degree of institutional security without more than a *de minimus* cost to the ADC. Furthermore, prison officials are not required to analyze every possible alternative before adopting a reasonable policy. *Id.* at 90-91. According to the evidence in the record, the earlier policy that utilized manual searches and scanners failed to prevent K2 from entering the prison system at alarming rates and causing inmate overdoses and deaths. This factor, therefore, weighs in Defendant Kelley's favor.

      e.   Conclusion

Here, each *Turner* factor militates in favor of upholding the ADC's current policy. Mr. Banks has failed to show that the ADC correspondence policy limiting his mail to three pages of black and white photocopies violates his first amendment rights. See also *Simpson v. County of Cape Girardeau, Missouri*, 879 F.3d 273 (8th Cir. 2020) (mail policy that limited incoming correspondence mail to a single postcard did not violate the Constitution).

      2.   Five-Photograph Retention Policy

         a.   Rational Connection between Regulation and Governmental Interest

The limits on the number of photographs each inmate can possess at one time are, likewise, permissible. Defendant Kelley testified that the limit on photographs was imposed to reduce the burden on officials of keeping an inventory and maintaining control of property levels, mitigating the risk of fire that excessive papers poses, and dealing with inmate claims of lost or stolen photographs. This testimony supports a

finding of a rational connection between the limit on photographs and the State's interest in preserving safety at the prison and lowering costs.

### b. Alternative Means for Inmates to Exercise Right

The five-photograph limit on "hard copies" of photographs does not affect inmates' ability to keep additional digital photographs through the use of an approved MP4 player. In addition, inmates may rotate the photographs they keep in their possession. Because inmates have alternative means to access photographs, this factor weighs in favor of Defendant Kelley.

### c. The Impact of the Accommodation

Based on the evidence presented, allowing an inmate to possess more than five photographs would cause a reallocation of time correction officers have to spend inventorying and addressing complaints for lost or stolen photographs, thereby interfering with the ADC's ability to maintain security and efficiency. Given the degree of deference due to correction officers when there is a significant ripple effect on prison staff, as there is here, this factor weighs in Defendant Kelley's favor.

### d. Whether Any Ready Alternatives Exist

Mr. Banks has not identified alternatives to the five-photograph limit that would accomplish the ADC's goal of providing institutional security without more than a *de minimus* cost to the ADC. Given the security concerns at issue here and deference due prison officials in matters of security, this factor also weighs in Defendant Kelley's favor.

e. Conclusion

Each *Turner* factor favors upholding the ADC's current policy limiting inmates to possessing five photographs at a time. The five-photograph retention policy does not violate Mr. Banks's first amendment rights.

B.  Fourteenth Amendment

Mr. Banks also contends that these ADC policies has deprived him of his protected liberty and property interests without due process of the law in violation of his fourteenth amendment rights.

1.  Liberty Interest

Mr. Banks has a fourteenth amendment right to procedural due process only if he has a liberty interest at stake. See *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir. 2003). There is no liberty interest in retaining more than five photographs while in prison.

Prisoners and their correspondents do have a liberty interest in "uncensored communication by letter." *Procunier v. Martinez*, 416 U.S. 396, 417 (1974), overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989). Certain procedural safeguards must be put in place to protect this liberty interest: (1) the inmate must be notified of the rejection of a letter; (2) the author of the letter must be given a reasonable opportunity to protest the decision; and (3) complaints must be referred to a prison

official other than the person who disapproved the correspondence. *Procunier v. Martinez*, 416 U.S. 396, 418-419 (1974).

Here, all incoming correspondence is copied and delivered to Mr. Banks unless it exceeds the three-page limit. There is no limit on outgoing mail inmates may send. Mr. Banks can return mail to the sender if the mail is rejected because it does not comply with the mail policy, provided he pays for the postage. And the ADC does not censor any general correspondence based on content.

The challenged ADC policy does not interfere with Mr. Banks's liberty interest in corresponding with individuals outside of prison because there is no content-based censorship. See also *Bratcher v. Clark*, 2018 WL 4658684, *15 (E.D. Virg. 2018) (no liberty interest at stake where there is no content-based censorship in the prison policy limiting inmate's rights to correspond with non-incarcerated individuals to three photocopied pages); see also *Human Rights Def. Ctr. v. Baxter County, Ark.*, 360 F. Supp. 3d 870, 871 (W.D. Ark. 2019) (content-neutral correspondence policies are not subject to same due process requirements as those involving content censorship).

Accordingly, neither the policy limiting inmates' incoming mail to three pages nor the policy limiting inmates to retention of five photographs implicates a liberty interest that would trigger the protection of the due process clause.

2. Property Interest

Prisoners maintain a property interest in mail they are authorized to receive; however, they do not enjoy the same interests with respect to contraband. *Parratt v. Taylor*, 451 U.S. 527, 529-31 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U. S. 327 (1986); see also *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984) ("Because property was contraband, [plaintiff] cannot seriously argue that he had a protected property interest in it.").

Because the ADC's correspondence policy considers correspondence that exceeds three pages per letter and photographs over the five-photograph limit as contraband, Mr. Banks has no property interest in those items. There is no due process right at issue.

## VI. Conclusion

The Court recommends that Defendant Kelley's motion for summary judgment (Doc. No. 67) be GRANTED. Mr. Banks's claims should be DISMISSED, with prejudice.

DATED this 22nd day of April, 2021.

                                             _____
                                             UNITED STATES MAGISTRATE JUDGE